**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| MARCIA GOINS, | CASE NO. 1:21-CV-01383 |
| Plaintiff, | MAGISTRATE JUDGE AMANDA M. KNAPP |
| vs. | **MEMORANDUM OPINION AND ORDER** |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

Plaintiff Marcia Goins ("Plaintiff" or "Ms. Goins") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned pursuant to the consent of the parties. (ECF Doc. 14.) For the reasons explained herein, the Court **AFFIRMS** the Commissioner's decision.

## I.      Procedural History

### A.      Prior Application

Ms. Goins filed prior applications for SSI and DIB on May 26, 2016. (Tr. 66.) Her applications were denied initially and on reconsideration. (*Id*.) She requested a hearing and on September 17, 2018 an Administrative Law Judge (hereinafter "prior ALJ") found her not

1

disabled from the alleged disability onset date of February 15, 2014 through the date of the decision.  (Tr. 63-86 ("2018 ALJ decision").)  The 2018 ALJ decision held that Ms. Goins had the residual functional capacity ("RFC") to perform a reduced range of sedentary work.  (Tr. 72.) Ms. Goins requested review by the Appeals Council.  (Tr. 87.)  The Appeals Council denied her request for review.  (Tr. 87-93, 94-100.)

**B.      Current Application**

Ms. Goins filed the SSI and DIB applications that are the subject of this appeal on July 30, 2019.  (Tr. 12, 141, 252-58, 259-65.)  She asserted a disability onset date of November 1, 2017.  (Tr. 12, 252.)  She alleged she was disabled due to lupus, spinal stenosis, rheumatoid arthritis, fibromyalgia, sciatic nerve problems on right, deteriorated disc on left, back issues, bilateral carpal tunnel, knee damage, right shoulder damage, chronic bronchitis, and depression. (Tr. 102, 113, 121-22, 133, 186, 194, 281.)  Her applications were denied at the initial level (Tr. 185-91) and upon reconsideration (Tr. 194-205)  She requested a hearing (Tr. 207), which was held before an Administrative Law Judge ("ALJ") on September 3, 2020 (Tr. 34-62).

On September 28, 2020, the ALJ issued an unfavorable decision, finding Ms. Goins had not been under a disability within the meaning of the Social Security Act from September 18, 2018 through the date of the decision.  (Tr. 9-33.)  Ms. Goins requested review of the decision by the Appeals Council.  (Tr. 249-51.)  On May 28, 2021, the Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)

## II.      Evidence

Although the ALJ identified multiple severe physical and mental impairments (Tr. 15-16), Ms. Goins' challenge to the ALJ's decision primarily relates to his evaluation of her back

and right shoulder impairments.  (ECF Doc. 11, pp. 17-20.)  The evidence summarized herein is accordingly focused on evidence pertaining to those impairments.

A.    **Personal, Educational, and Vocational Evidence**

Ms. Goins was born in 1971.  (Tr. 26, 252.)  She has a high school education.  (Tr. 26, 58, 282.)  She has past relevant work as a home health aide and as a security alarm dispatcher.  (Tr. 26, 55-56.)  After the 2018 ALJ decision, Ms. Goins babysat for her nephew on a limited basis for nominal pay.  (Tr. 42-43, 55.)

B.    **Medical Evidence Prior to 2018 ALJ Decision**

On September 1, 2016, Ms. Goins attended a consultative examination conducted by internal medicine doctor Dorothy Bradford M.D. (Tr. 501-09).  On examination, she was observed to be morbidly obese, she used a cane for support on her right side, her gait was antalgic on the right, and she wore a brace on her left knee.  (Tr. 506, 508, 509.)  She had full range of motion in her upper extremities, but a decreased range of motion in her spine and hips.  (Tr. 503-04, 508, 509.)  Dr. Bradford stated Ms. Goins was "a fall risk on an uneven surface for long distances" and opined that Ms. Goins had:

> DJD of the knees and lumbar spine with radicular symptoms on the right.  She [had] non insulin dependent diabetes and hypertension.  Pedal pulses [were] diminished.  Monofilament testing on the soles [was] absent.  She clinically [might] have peripheral vascular disease and peripheral neuropathy as well.

(*Id*.)

A February 8, 2017 lumbar spine x-ray showed stable mild degenerative changes.  (Tr. 1037-38.)  On May 5, 2017, Ms. Goins saw Kimberly Wiebusch, PT at the Cleveland Clinic for a physical therapy evaluation due to leg pain and back pain that reportedly started ten years earlier but had worsened over the past two or three years.  (Tr. 949-50.)  She also reported knee pain.  (Tr. 950.)  Ms. Goins' stated goals were to improve her mobility and walk without a cane.  (*Id*.)

3

She attended physical therapy in May and June 2017.  (Tr. 940, 942, 944, 946, 947.)  During therapy sessions in June 2017, she reported that her back did not hurt as bad and she was doing okay, but reported pain in her neck and shoulders.  (Tr. 941, 943.)  Ms. Goins did not attend therapy appointments in July 2017, but attended in August and September 2017.  (Tr. 932-38, 940.)  A cervical spine x-ray taken on August 9, 2017 showed reversal of cervical lordosis with mild degenerative changes.  (Tr. 924, 1036-37.)

On October 2, 2017, Ms. Goins saw Eric Mayer, M.D. at the Cleveland Clinic Center for Spine Health for an evaluation regarding her neck and shoulder complaints.  (Tr. 920-25.)   She reported attending aquatic therapy for her low back pain with improvement, but no therapy for her neck.  (Tr. 920.)  Her medications included Mobic, Gabapentin, and Flexeril.  (*Id*.)  She was assessed with right shoulder pain, consistent with impingement syndrome versus biceps tendonitis superimposed with cervical myofascial pain, right lateral epicondylitis, and right-handed numbness.  (Tr. 924.)  Dr. Mayer recommended further diagnostic testing and physical therapy and adjusted her medications.  (*Id*.)

On October 10, 2017, Ms. Goins had an MRI of her cervical spine.  (Tr. 1022-24.)  The MRI showed congenital narrowing in conjunction with degenerative changes, resulting in moderate stenosis at C3-C5 and mild stenosis at C2-C3 and C5-C6.  (Tr. 1022.)  On October 11, 2017, Ms. Goins had an EMG of her upper extremities which showed no evidence of nerve injury in her neck or cervical radiculopathy.  (Tr. 711, 913.)  There was evidence of moderate bilateral carpal tunnel syndrome.  (Tr. 913.)  She attended physical therapy in October (Tr. 907, 911) and continued to follow with Dr. Mayer regarding her right shoulder (Tr. 909-11).  At a physical therapy appointment on October 23, 2017, Ms. Goins displayed high levels of pain and

showed little improvement.  (Tr. 908.)  Her therapist recommended that they hold off on therapy because of her low tolerance for it.  (*Id*.)

On October 27, 2017, Ms. Goins saw Toomas Anton, M.D. for a neurosurgical evaluation due to pain throughout her body.  (Tr. 905-06.)  Dr. Anton reviewed her cervical spine MRI, and noted that it was essentially normal.  (Tr. 906.)  On examination, Dr. Anton observed that she was morbidly obese.  (*Id*.)  Her cervical range of motion was reduced but she had full strength in her bilateral deltoids, biceps, triceps, and hand intrinsic muscles.  (*Id*.)  Dr. Anton felt she had diffuse pain syndrome and did not recommend neurosurgical intervention.  (*Id*.)  Instead, he recommended that she follow up with pain management.  (Tr. 906-07.)

On November 28, 2017, Ms. Goins saw Bassam Alhaddad, M.D. at Premier Physicians for arthritis and chronic pain syndrome.  (Tr. 829-35.).  She demonstrated normal flexion, extension, and lateral bending in the cervical spine and normal forward and lateral bending, no tenderness, and an unremarkable straight leg raise test in the lumbar spine.  (Tr. 829.) Examination of her shoulders showed limited range of motion in her right shoulder, a positive empty can test, and significant tenderness of the glenohumeral joint.  (Tr. 809, 829.)  Multiple tender points were observed in her neck, shoulders, elbows, hips, and anterior knees.  (Tr. 809.) She was diagnosed with bursitis of the right shoulder and fibromyalgia.  (Tr. 829.)  Dr. Alhaddad recommended further diagnostic testing, possible injections, and physical therapy.  (*Id*.)  She had positive ANA testing.  (Tr. 1005.)

On December 7, 2017, Ms. Goins returned to Dr. Alhaddad for follow up.  (Tr. 827.)  Dr. Alhaddad discussed her lab results, including her positive ANA results, and explained that the likelihood she had lupus was low, but he could not rule out the possibility of inflammatory arthritis.  (*Id*.)  Ms. Goins continued to have limited range of motion in her right shoulder.  (*Id*.)

Dr. Alhaddad started her on Plaquenil and administered a subacromial bursa injection in the right shoulder.  (*Id*.)

On February 8, 2018, Ms. Goins returned to Dr. Alhaddad for follow up with complaints of knee and low back pain.  (Tr. 825.)  Dr. Alhaddad continued to suspect inflammatory arthritis.  (*Id*.)  He discontinued Plaquenil and prescribed a steroid pack.  (*Id*.)  Examination showed improved right shoulder range of motion but tenderness in her shoulder joints bilaterally.  (Tr. 826.)  Vectra Testing, which assesses diseased activity in individuals with rheumatoid arthritis, was done that day.  (Tr. 720.)  Her Vectra DA Score was 49, which fell within a high disease activity level.  (*Id*.)

On February 14, 2018, Ms. Goins was treated for fibromyalgia at Integrative Pain Care, LLC, where she saw Adam Hedaya, M.D.  (Tr. 684.)  Examination findings were generally normal.  (Tr. 686-87.)  Dr. Hedaya recommended a low dose of Cymbalta and possible facet blocks, and counseled her on activity modification.  (Tr. 687.)

On February 26, 2018, lumbar spine x-rays were taken.  (Tr. 703.)  They showed degenerative changes, mild rotoscoliosis, and disc disease without acute fracture or subluxation.  (*Id*.)  On February 26, 2018, Ms. Goins' Vectra DA Score was 44, falling at the high-end of moderate disease activity level.  (Tr. 712.)

On February 28, 2018, Ms. Goins returned to Dr. Hedaya. (Tr. 679-83.)  On examination, she exhibited severe tenderness to palpation over her lumbar sacral spine but no tenderness over her spinous process.  (Tr. 682.)  She demonstrated positive facet loading bilaterally, with considerable guarding and reduced range of motion.  (*Id*.)  However, she ambulated normally, her musculoskeletal examination was normal, with normal tone and strength and no edema, and

6

her sensation was grossly intact.  (Tr. 682-83.)  Dr. Hedaya continued to counsel her regarding activity modification.  (Tr. 683.)

On March 26, 2018, Dr. Hedaya administered lumbar facet block injections.  (Tr. 677, 679.)  On April 6, 2018, Ms. Goins returned to Dr. Hedaya for follow up after her injections.  (Tr. 672.)  She demonstrated tenderness to palpation, considerable guarding, and reduced range of motion in multiple areas, including the thoracic and lumbosacral spines and trochanteric bursa.  (Tr. 675.)  However, she ambulated normally, her musculoskeletal examination was normal, with normal tone and strength and no edema, and her sensation was grossly intact.  (Tr. 675-76.)  Dr. Hedaya indicated that Ms. Goins did well with her shot but complained of leg spasms.  (Tr. 676.)  He continued to counsel her regarding activity modification.  (*Id.*)  A thoracic spine x-ray on April 6, 2018 showed mild spondylosis, mainly in the mid to upper thoracic spine levels.  (Tr. 699.)

On June 6, 2018, Ms. Goins had a lumbar spine MRI due to low back pain and lumbosacral radiculopathy.  (Tr. 694-95.)  Findings included evidence of disc bulge and disc herniation at multiple levels with varying degrees of stenosis.  (*Id.*)  The impression noted: epidural lipomatosis / congenital central canal narrowing, multilevel degenerative changes, and no substantial flavum hypertrophy.  (Tr. 695.)

On August 17, 2018, Ms. Goins returned to Dr. Hedaya with complaints of chronic pain and leg spasms.  (Tr. 667-71.)  She demonstrated tenderness to palpation, considerable guarding, and reduced range of motion in multiple areas, including the thoracic and lumbosacral spines and trochanteric bursa.  (Tr. 670.)  However, she ambulated normally, her musculoskeletal examination was normal, with normal tone and strength and no edema, and her sensation was

grossly intact.  (Tr. 670-71.)  Dr. Hedaya recommended thoracic medial branch blocks and lumbosacral facet joint injections.  (Tr. 671-72.)

Ms. Goins returned to Dr. Alhaddad on August 23, 2018, reporting some improvement with Methotrexate but continued pain and stiffness.  (Tr. 821.)  Dr. Alhaddad suspected a combination of rheumatoid arthritis and fibromyalgia, and recommended adding Plaquenil and a steroid taper.  (*Id*.)  He also recommended that she continue with regular exercises.  (*Id*.)  On examination, Ms. Goins demonstrated improved right shoulder range of motion, but continued joint tenderness bilaterally.  (Tr. 822.)  She also demonstrated bilateral wrist tenderness but normal range of motion in her wrists.  (*Id*.)

**C.    Medical Evidence Subsequent to 2018 ALJ Decision**

On September 17, 2018, Ms. Goins returned to Dr. Hedaya.  (Tr. 653-58.)  She continued to demonstrate tenderness to palpation, considerable guarding, and reduced range of motion in multiple areas, including the thoracic and lumbosacral spines and trochanteric bursa.  (Tr. 656.)  She also continued to ambulate normally, with a normal musculoskeletal examination and grossly intact sensation.  (*Id*.)  She continued to report chronic pain and leg spasms.  (Tr. 657.)  Dr. Hedaya again recommended proceeding with thoracic medial branch blocks and lumbosacral facet joint injections.  (Tr. 656-57.)  On October 1, 2018, Dr. Hedaya administered lumbar facet injections.  (Tr. 650-53).

On October 9, 2018, Ms. Goins presented to the emergency room at Marymount Hospital.  (Tr. 522, 730.)  She complained of spasms in her back, chest, legs, and hands.  (*Id*.)  She reported receiving a recent injection for her spasms, but said they had returned.  (*Id*.)  Ms. Goins left the emergency room after triage without being seen.  (Tr. 731.)

Ms. Goins returned to Dr. Hedaya on October 12, 2018, complaining of neck, hip, back and knee pain.  (Tr. 646-50.)  Treatment notes described her as having chronic pain and being "[status post] bilateral lumbar facet injections with significant improvement."  (Tr. 649.)  Her back pain was doing well but she complained of knee and neck pain.  (*Id*.)  Dr. Hedaya ordered MRIs and proceeded with a knee injection.  (Tr. 649-50.)  Ms. Goins also had lumbar facet injections that day.  (Tr. 1126-27.)

Ms. Goins again returned to Dr. Hedaya on November 30, 2018.  (Tr. 1122.)  She reported significant improvement from her facet injections, and said her back pain was doing well.  (Tr. 1125.)  Her knee pain was also improving.  (*Id*.)

Ms. Goins returned to Dr. Alhaddad on December 4, 2018.  (Tr. 819, 1256.)  Dr. Alhaddad indicated Ms. Goins could have SLE, but definitely felt she had inflammatory arthritis with positive ANA and no organ involvement.  (*Id*.)  He noted that she could not tolerate Plaquenil and had low to moderate disease activity, and added Lyrica and Sulfasalazine.  (*Id*.)  He also noted improved right shoulder range of motion, but that she continued to have tenderness in her bilateral joints, including her wrists.  (Tr. 820, 1257.)  Otherwise, examination findings were normal.  (*Id*.)  On December 4, 2018, her Vectra DA Score was 50, which falls within a high level of disease activity.  (Tr. 714.)

Ms. Goins saw Mohammed Shahed, M.D. in the internal medicine department at the Cleveland Clinic on January 9, 2019, after being in the emergency room a week earlier for bronchitis.  (Tr. 878, 1141.)  She reported that she continued to have body aches and pain related to her rheumatoid arthritis and fibromyalgia, but also reported doing well with Lyrica.  (*Id*.)  Dr. Shahed discussed a possible need for bariatric surgery due to her obesity and multiple medical problems.  (*Id*.)  On examination, she demonstrated normal neck and musculoskeletal range of

motion and no musculoskeletal edema or tenderness.  (Tr. 881, 1145.)  She had a normal gait.  (*Id*.)  Her emergency room records from earlier that week also noted normal neck range of motion and no musculoskeletal edema or tenderness.  (Tr. 740, 742.)

On February 4, 2019, Ms. Goins returned to Dr. Shahed for a cough and reported that she continued to have neck and back pain.  (Tr. 874.)  On examination, she demonstrated normal neck and musculoskeletal range of motion and no musculoskeletal edema or tenderness.  (Tr. 876.)  She had a normal gait.  (*Id*.)

On March 21, 2019, Ms. Goins returned to Dr. Shahed for a follow-up visit regarding aches and pains associated with her osteoarthritis and rheumatoid arthritis.  (Tr. 862.)  She reported that Lyrica was not helping with her pain.  (*Id*.)  After she inquired about medical marijuana, Dr. Shahed approved her to see a physician who specialized in medical marijuana.  (Tr. 862, 865.)  Her examination again reflected normal neck and musculoskeletal range of motion, no musculoskeletal edema or tenderness, and a normal gait.  (Tr. 864-65.)  Dr. Shahed advised her to see her rheumatologist about adjusting her medications.  (Tr. 865.)

On April 15, 2019, Ms. Goins returned to Integrative Pain Care, LLC, where she saw Mariah Jutte, PA regarding her neck, back and knee pain.  (Tr. 1118.)  It was noted that she had prior bilateral facet injections and thoracic medial branch blocks "with significant improvement for a few months."  (Tr. 1121.)  However, she reported that her pain had returned and she wanted to repeat the injections.  (*Id*.)

Ms. Goins returned to Dr. Alhaddad on April 17, 2019.  (Tr. 815.)  It was noted that her inflammatory markers remained elevated, that her weight might be contributing to the elevated CRP, and that she was "[c]linically doing a little better with sulfasalazine and methotrexate."  (*Id*.)  She agreed to try Plaquenil again. (*Id*.)  She reported still having pain, but that it was not as

bad.  (*Id*.)  She reported that the pain in her legs, knees, arms, and right hand had been more painful lately.  (*Id*.)  On examination, her range of motion in the right shoulder was improved but she continued to have bilateral joint tenderness, including tenderness in her wrists and the PIP joints in her hands.  (Tr. 818.)  On May 13, 2019, Ms. Goins underwent another round of lumbar facet joint injections.   (Tr. 1117.)

On July 15, 2019, Ms. Goins saw Morgan Jones, M.D. at the Cleveland Clinic Sports Health Center regarding her right shoulder pain.  (Tr. 789.)  She reported severe burning pain with limited range of motion.  (*Id*.)   She also reported neck pain, numbness and tingling, and night pain.  (*Id*.)  On examination, she had "pain at extremes of neck motion."  (Tr. 792.) Examination of the left shoulder was normal, but examination of the right shoulder showed decreased range of motion with active and passive range of motion, tenderness, and decreased muscle strength.  (Tr. 792-93.)  She also had a positive Jobe test and Spurling signs.  (*Id*.)  There was no swelling, and her stability, sensation, reflexes, and pulses were normal.  (*Id*.)   Dr. Jones reviewed imaging, noting that it was "Abnormal, reactive changes in rotator cuff tendon and mild DJD."  (*Id*.)  Ms. Goins was diagnosed with right shoulder rotator cuff tear, adhesive capsulitis, and cervicalgia.  (*Id*.)   She received a corticosteroid injection in her shoulder.  (*Id*.) A July 15, 2019, x-ray of the right shoulder showed mild degenerative change.  (Tr. 1175-76.)

Ms. Goins returned to Dr. Alhaddad on July 17, 2019, complaining of leg swelling. (Tr. 810.)  Dr. Alhaddad felt that the swelling might be related to her medications and advised her to decrease one medication and wear compression stockings.  (*Id*.)  He noted her rheumatoid arthritis was under better control and advised her to continue taking Lyrica for her fibromyalgia. (*Id*.)  Her CRP has improved significantly.  (Tr. 810, 812.)  Her physical examination findings were unchanged from her April 2019 visit with Dr. Alhaddad.  (*Compare* Tr. 814 *with* Tr. 818.)

Ms. Goins also returned to Dr. Hedaya on July 17, 2019.  (Tr. 1109-14.)  Her physical examination showed tenderness to palpation in multiple areas, including severe tenderness over the lumbar sacral spine, but no tenderness over the spinous process.  (Tr. 1113.)  She demonstrated positive facet loading bilaterally, considerable guarding, and reduced range of motion.  (*Id*.)  However, she ambulated normally, and her musculoskeletal tone and strength were normal, she had no edema, and her sensation was grossly intact.  (*Id*.)  Dr. Hedaya noted that she had chronic pain and was "[status post] lumbar facets with great relief" and her back pain was doing well with significant improvement for a few months after her injections and blocks.  (*Id*.)  Her thoracic pain had returned and she was interested in repeating the medial branch blocks, but she wanted to have the blocks done at a different location.  (*Id*.)

Ms. Goins returned to PA Jutte on August 14, 2019.  (Tr. 1103-08.)  Examination findings were generally the same as those noted during her July 17, 2019 visit with Dr. Hedaya.  (*Compare* Tr. 1107 *with* Tr. 1113.)  Ms. Goins reported she had not been able to get the medial branch blocks due to transportation, and PA Jutte prescribed a Medrol Dose pack.  (Tr. 1108.)

On August 22, 2019, Ms. Goins saw Rueben Gobezie, M.D. at Noms Healthcare regarding her right shoulder pain.  (Tr. 1194.)  She reported having an injection about a month earlier with relief for about two weeks.  (*Id*.)  She also reported that she continued to have pain that radiated into her elbow and scapular area, which was better with motion, and that she had pain at night.  (*Id*.)  On examination, she demonstrated decreased range of motion of the right shoulder.  (Tr. 1195.)  Dr. Gobezie diagnosed adhesive capsulitis of the right shoulder and discussed conservative and surgical treatments.  (*Id*.)  Ms. Goins indicated a desire to proceed with surgery and said she would call to schedule it.  (*Id*.)

12

On August 29, 2019, Ms. Goins saw Dr. Shahed for an annual physical exam.  (Tr. 1165.)
She continued to report diffuse body aches with arthralgia and myalgia and chronic low back
pain.  (*Id*.)  She reported that she was using a cane to ambulate.  (*Id*.)  She also indicated she was
"probably going for potential surgery for her right adhesive capsulitis and rotator cuff rupture on
the right side."  (*Id*.)  Examination findings were normal.  (Tr. 1169.)

Ms. Goins returned to Noms Healthcare on September 16, 2019, where she saw Allyson
Skebe, PA.  (Tr. 1197.)  Treatment notes reflect that she was approved for right subacromial
decompression, capsular release, and right biceps tenotomy surgery, and was going to call to
schedule her surgery.  (Tr. 1198.)

On October 3, 2019, Ms. Goins had additional medial branch block injections.  (Tr.
1237, 1240.)  On October 17, 2019, she returned to Dr. Alhaddad, complaining of left ankle pain,
bruising, and leg pain.  (Tr. 1242.)  She reported doing fair with respect to her joint pain.  (*Id.*)
Dr. Alhaddad noted that her rheumatoid arthritis was in low disease activity.  (*Id*.)  On
examination, the range of motion in her right shoulder was limited and she had tenderness in
both wrists and PIP joints.  (Tr. 1245.)  Otherwise, her examination findings were unremarkable.
(*Id*.)  Dr. Alhaddad adjusted her medications.  (Tr. 1242.)

On October 28, 2019, Ms. Goins returned to Dr. Shahed for a follow-up visit.  (Tr. 1287-
88.)  She reported that she was planning to have shoulder surgery in January and continued to
have chronic pain related to her obesity.  (Tr. 1288.)  An examination showed normal neck and
musculoskeletal range of motion, no edema, and a normal gait.  (Tr. 1290.)

On November 29, 2019, Ms. Goins presented to the emergency room for a persistent
cough.  (Tr. 1371.)  An examination showed normal musculoskeletal range of motion and trace
bilateral lower extremity edema.  (Tr. 1373.)

On February 20, 2020, Ms. Goins returned to Dr. Alhaddad, reporting body aches and active inflammatory arthritis with pain and stiffness in multiple joints notwithstanding her treatment regimen. (Tr. 1491.)  Dr. Alhaddad discussed trying a biologic.  (*Id*.)  Ms. Goins was open to the idea but wanted to think about it, reporting that she was needle phobic.  (*Id*.)  Dr. Alhaddad increased her Methotrexate and Lyrica.  (*Id*.)  On examination, the range of motion in her right shoulder was limited and she demonstrated tenderness in both wrists and PIP joints. (Tr. 1495.)  Otherwise, her examination findings were unremarkable.  (*Id*.)

On March 18, 2020 and April 1, 2020, Ms. Goins returned to Dr. Hedaya.  (Tr. 1522, 1528.)   During the physical examinations, she reported severe tenderness over the cervical spine but no tenderness over the trochanteric bursa.  (Tr. 1526, 1531.)  She reported considerable reduced range of motion but ambulated normally.  (Tr. 1526, 1532.)  Dr. Hedaya and she discussed repeat injections, but decided to wait due to Covid-19 concerns.  (Tr. 1527.)  Dr. Hedaya advised her to continue taking Topamax, Lyrica, and Flexeril, and prescribed diclofenac topical and lidocaine.  (Tr. 1527, 1533.)

Ms. Goins returned to Dr. Alhaddad in June 2020, reporting that her joint pain improved following the increase in Methotrexate and folic acid.  (Tr. 1499.)  She had stopped taking Plaquenil due to intolerance.  (*Id*.)  She reported that her energy level was fair, but she had occasional pain in her shoulder and hips and no change in her back pain.  (*Id*.)  She continued to follow with pain management and reported that she planned to get more nerve blocks soon.  (*Id*.)

## D.    Medical Opinion Evidence

On October 10, 2019, state agency reviewing medical consultant Gerald Klyop, M.D. adopted the prior ALJ's 2018 physical RFC finding.  (Tr. 136-37.)  On January 16, 2020, state

agency reviewing medical consultant Linda Hall, M.D. adopted the prior ALJ's 2018 physical RFC finding on reconsideration.  (Tr. 156-57.)

### E.    September 3, 2020 Hearing

#### 1.    Plaintiff's Testimony

Ms. Goins testified in response to questioning by the ALJ and her representative at the September 3, 2020, hearing.  (Tr. 41-56, 58.)   She reported living with her boyfriend and his mother.  (Tr. 43.)  She indicated she was not really able to perform household chores.  (Tr. 44, 46-47.)  She could usually do her own hair and dress herself, but sometimes needed assistance washing her back and putting on her socks and bra because of limited range of motion in her arms and difficulty bending.  (Tr. 44-45.)  She reported having greater problems using her right arm than her left.  (Tr. 44.)

Ms. Goins reported that she had "[e]xtreme excruciating pain" with bending at times, and that she also had spasms throughout her body depending on the motion.  (Tr. 45.)  She explained that her worst pain was in her back and upper legs, but that she got some relief by changing positions.  (Tr. 46.)  Her pain disturbed her sleep and was aggravated by household chores like sweeping, mopping, or vacuuming.  (Tr. 46, 53.)  She estimated getting about four or five hours of interrupted sleep each night, explaining that she usually woke up every hour and a half to two hours.  (Tr. 53.)  She reported taking three or four naps during the day.  (Tr. 53-54.)  She rated her pain a six or seven out of ten with medicine.  (Tr. 47.)  She reported having about ten days per month where her pain was above average.  (*Id*.)  On those days, she said she could not do much of anything.  (Tr. 47-48.)  She could not rate her pain level without medicine because she was never not taking medicine.  (Tr. 47.)

Ms. Goins did not have a driver's license.  (Tr. 45.)  If she needed to go to the store, she explained that a friend or family member would take her or she would use "carriage transit." (*Id*.)  She was able to go to the store by herself, but she had low back pain with walking and her legs gave out at times.  (*Id*.)  She estimated being able to sit for twenty to thirty minutes before having to get up and move around, and being able to stand for five to ten minutes before needing to rest for twenty minutes.  (Tr. 48-49.)  She estimated she could walk for ten to fifteen minutes before needing to stop and stretch or sit down.  (Tr. 49.)  She tried not to lift objects that weighed more than five pounds because she had a hard time carrying and holding on to objects and because it caused cramping in her back and legs.  (Tr. 49-50.)  She also reported that she had a hard time holding on to objects that were small.  (Tr. 50.)  She got some forewarning before her left hand opened and caused her to drop an item because it would "shake a little bit."  (*Id*.)  She did not get that same type of indication with her right hand, explaining she could be "walking through [her] home with a cup of coffee, and it just opens and drops."  (*Id*.)  She said it was hard for her to button things because her fingers would "lock or cramp."  (Tr. 51.)

Ms. Goins reported that her right shoulder ached and hurt all the time.  (Tr. 51.)  She could not lift with it and could not raise her arm straight up.  (*Id*.)  She could reach in front of her if she pushed herself, but she felt "tingles and pain" if she did.  (*Id*.)  She explained that shoulder surgery had been considered but she had not had it, first because she had pneumonia and then because of Covid.  (Tr. 50-51.)  She said she was also trying to wait to have back injections. (*Id*.)  When asked whether she felt her right shoulder condition was better, worse, or about the same since her hearing in 2018, she stated:

> I think it is really worse . . . Radiating pain, my range of motion, just being able to use it, period.  I recently had my hair cut off because I can't lift my arm up to it. 2018 I was able to do that.

(Tr. 52.)

Ms. Goins had injections in her low back and thoracic spine that helped with her pain, but

then the pain returned.  (Tr. 52.)  She reported that the injections never took her pain completely

away, but her pain became more bearable for about six months after receiving injections.  (*Id.*)

She reported using a cane for about four or five years, and said it was first prescribed by pain

management and then by a rheumatologist.  (Tr. 52, 54.)  She used the cane to help her walk,

deal with pain, and balance.  (Tr. 53.)  She reported using the cane less when she was at home

because there was always something for her to hold onto.  (Tr. 52-53.)  She also reported having

a knee brace.  (Tr. 54.)

### 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 56-61.)  The VE described Ms.

Goins' prior home health aide position as a semi-skilled job that she performed at the medium

exertional level.  (Tr. 57.)  He described her prior security dispatcher position as a skilled job that

she performed at the sedentary exertional level.  (*Id.*)

For his first hypothetical, the ALJ asked the VE to assume an individual of Ms. Goins'

age and with her education and vocational background with the RFC to perform sedentary work

who could:

> frequently operate right and left foot controls, she could frequently operate right
> and left hand controls.  She could occasionally reach over head with her right and
> left upper extremities and she can frequently reach in all other directions with either
> extremity.  The individual could frequently handle with either hand and frequently
> finger with either upper extremity and could occasionally climb ramps and stairs,
> but she cannot climb ladders, ropes or scaffolds.  She can . . . occasionally balance,
> stoop, kneel, crouch or crawl.  She can be exposed to unprotected heights, moving
> mechanical parts and she cannot operate a motor vehicle.  She could frequently be
> exposed to humidity, wetness, odors, dusts and pulmonary irritants, extreme cold
> or extreme heat and she is limited to performing simple, routine and repetitive tasks
> but not at a production rate pace such as assembly line work.  She is limited to
> simple work related decisions in using her judgment and dealing with changes in

the work setting and she is able to frequently interact with supervisors, coworkers and the public.

(Tr. 58-59.)  The VE testified that the described individual would be unable to perform Ms. Goins' past work but there would be other work that the individual could perform, including assembler and inspector.  (Tr. 59.)

For his second hypothetical, the ALJ asked the VE to assume the same limitations as the first hypothetical, except that the individual would be limited to occasional handling and fingering with the dominant right upper extremity.  (Tr. 59.)  The VE testified that with the additional limitation, the previously identified jobs would not be available and there would be no other unskilled sedentary jobs.  (Tr. 59-60.)  The ALJ also asked the VE about tolerances for off-task behavior and absenteeism.  (Tr. 60.)  The VE responded: "being off task 15% or more of the time on a consistent basis and/or missing two days of work a month would preclude sustained [competitive] work activity."  (*Id*.)

Ms. Goins' counsel asked the VE whether his response to the first hypothetical would change if the individual as described in the first hypothetical also needed to use a cane when ambulating or standing.  (Tr. 60.)  The VE testified that his response would not change.  (*Id*.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.   If the claimant is doing substantial gainful activity, he is not disabled.

2.   If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.   If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.   If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.   If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[1]  *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the Residual Functional

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

Capacity ("RFC") and vocational factors to perform other work available in the national economy. *Id.*

## IV.    The ALJ's Decision

The ALJ's findings are as follows:[2]

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2020.  (Tr. 15.)

2.    The claimant has not engaged in substantial gainful activity since September 18, 2018, the alleged onset date. (*Id.*)

3.    The claimant has the following severe impairments: fibromyalgia, rheumatoid arthritis, degenerative changes of the lumbar spine, scoliotic curvatures and degenerative change of the thoracic spine, degenerative changes of the cervical spine, degenerative changes of the right knee, right shoulder bursitis, moderate obstructive sleep apnea, chronic obstructive pulmonary disease (COPD), diabetes, hypertension, gastroesophageal reflux disease, obesity, and depression.  (Tr. 15-16.)

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  (Tr. 16-19.)

5.    The claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except she can frequently operate right and left foot controls; frequently operate right and left hand controls; occasionally reach overhead with the right and left; frequently in all other directions with the right and left; frequently handle with the right and the left; frequently finger with the right and the left; occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle; can frequently be exposed to humidity and wetness, dust, odors, fumes, and pulmonary irritants, extreme cold, and extreme heat; limited to performing simple, routine and repetitive tasks, but not at a production rate pace (i.e. assembly line work); limited to simple work related decisions in using her judgment and dealing with changes in the work setting; and able to frequently interact with supervisors, coworkers, and the public.  (Tr. 19-25.)

6.    The claimant is unable to perform any past relevant work.  (Tr. 25-26.)

---

[2] The ALJ's findings are summarized.

7.      The claimant was born in 1971 and was 46 years old, defined as a younger individual age 45-49, on the alleged disability onset date.  (Tr. 26.)

8.      The claimant has at least a high school education.  (*Id.*)

9.      Transferability of job skills is not material to the determination of disability. (*Id.*)

10.     Considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  (Tr. 26-28.)

Based on the foregoing, the ALJ found Ms. Goins had not been under a disability as defined in the Social Security Act from September 18, 2018 through the date of the decision. (Tr. 28.)

## V.      Plaintiff's Argument

Ms. Goins argues that the decision is not supported by substantial evidence because the ALJ erred by concluding that she had the same RFC as that adopted in the 2018 ALJ decision. (ECF Doc. 11, pp. 16-22.)

## VI.      Law & Analysis

### A.      Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      Sole Assignment of Error: Whether RFC Was Supported by Substantial Evidence**

Ms. Goins argues that the ALJ erred in concluding that her current RFC limitations remain the same as the RFC limitations adopted in the 2018 ALJ decision.  (ECF Doc. 11, pp. 16-20.)  Focusing on her low back and right shoulder impairments, Ms. Goins asserts that the ALJ selectively parsed the record and cherry-picked evidence when he adopted the same RFC, minimizing evidence that showed an obvious and significant worsening of symptoms.  (*Id*.)  Thus, she claims that the RFC is not supported by substantial evidence.  (*Id*. at p. 21.)

The Commissioner responds that the ALJ considered the new evidence and reasonably concluded that such evidence did not demonstrate a significant worsening of her condition, and therefore properly considered the prior ALJ decision.  (ECF Doc. 12, pp. 4-6.)  She also asserts that substantial evidence supports the RFC adopted by the ALJ.  (*Id*. at pp. 6-9.)

While the primary consideration before this Court is whether the RFC adopted by the ALJ in this case was supported by substantial evidence, the arguments of the parties nevertheless bring into question whether the ALJ appropriately considered the findings of the prior ALJ in reaching his current findings.  The Court will therefore begin with a discussion of the standards that govern the ALJ's consideration of the 2018 ALJ decision findings, and then continue to a broader discussion of whether the ALJ's RFC was supported by substantial evidence.

**1.      Whether ALJ Appropriately Considered 2018 ALJ Decision**

In *Drummond v. Comm'r of Soc. Sec.*, the Sixth Circuit cited to "the principles of res judicata" in holding: "Absent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ." 126 F.3d 837, 841-42 (6th Cir. 1997).  In a related Acquiescence Ruling, the Social Security Administration ("SSA") applied *Drummond* to disability findings as follows:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method of arriving at the finding.

AR 98-4(6), 63 Fed. Reg. 29771, 29773 (June 1, 1998).

More recently, in *Earley v. Commissioner*, the Sixth Circuit reexamined *Drummond* and its reliance on principles of res judicata, and observed: "Unusual facts, it seems to us, led to some overstatement in *Drummond* but not to an incorrect outcome." 893 F.3d 929, 933 (6th Cir. 2018). While the standard in *Drummond* was based on res judicata principles, the *Earley* Court clarified that "res judicata only 'foreclose[s] successive litigation of the very same claim,'" while "'a claim that one became disabled in 1990 is not the same as a claim that one became disabled in 1994.'" *Id.* (citations omitted). This fact, argued the Sixth Circuit, "helps to explain why *Drummond* referred to 'principles of res judicata' – with an accent on the word 'principles.'" *Id.* (citing 126 F.3d at 841–43). In other words, the *Earley* Court held that res judicata is not truly the standard at issue when a claimant seeks benefits for a new period of disability.

In clarifying the applicable standard, the *Earley* Court explained *Drummond*'s holding was not an issue of "preclusion," but was instead "'best understood as a practical illustration of the substantial evidence rule' in which the prior factual finding was 'such an important and probative fact as to render the subsequent finding to the contrary unsupported by substantial evidence.'" *Id.* at 934 (citing *Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473, 476–77 (4th Cir. 1999)). In articulating the Sixth Circuit standard going forward, the *Earley* Court explained: "Fresh review is not blind review. A later administrative law judge may consider what an earlier judge did if for no other reason than to strive for consistent decision making." *Id.* at 934.

24

In the present decision, the ALJ explained that he would "address the issue of disability beginning September 18, 2018, which [was] the day after the date of the prior final decision." (Tr. 12.)  He then acknowledged "that the record contains new and additional evidence," but concluded based on his review of the record as a whole that "the new and additional evidence does not provide a basis for a different finding of the claimant's functional limitations."  (Tr. 20.) For that reason, he "incorporated the findings regarding the claimant's functional limitations from the September 17, 2018 unfavorable decision into the present decision."  (*Id.*)

Both ALJs found Ms. Goins suffered from the same severe impairments: fibromyalgia, rheumatoid arthritis, degenerative changes of the lumbar spine, scoliotic curvature and degenerative change of the thoracic spine, degenerative changes of the cervical spine, degenerative changes of the rights knee, bilateral carpal tunnel syndrome, right shoulder bursitis, moderate obstructive sleep apnea, chronic obstructive pulmonary disease, diabetes, hypertension, gastroesophageal reflux disease, obesity and depression.  (Tr. 15, 69.)

With respect to the physical impairments at issue in this appeal, the prior ALJ observed:

The medical evidence showed that the claimant had a history of fibromyalgia, rheumatoid arthritis, and degenerative changes of her thoracic lumbar spine.  An x-ray of the claimant's thoracic spine revealed mild scoliotic curvature and degenerative changes.  An x-ray of her lumbar spine revealed degenerative changes and mild rotoscoliosis and disc disease.  An EMG and nerve conduction study revealed radiculopathy at her L5-S1.  Recent treatment notes indicated that the claimant exhibited tenderness to palpation of her lumbar sacral spine; however, she had full range of motion of her back, her straight leg raise was negative, and she ambulated independently.  To treat her back pain, the claimant underwent a lumbar facet block procedure.  Treatment notes also indicated that the claimant exhibited widespread tender points of her bilateral upper and lower extremities, including her neck, shoulders, elbows, hips and knees.  However, she did not exhibit any synovitis of her bilateral elbows, wrists or hands, and recent laboratory findings indicated that her anti-CCP, rheumatoid factor and CRP results were normal.

. . .

The medical evidence showed that the claimant had degenerative changes of her cervical spine, right shoulder bursitis and bilateral carpal tunnel syndrome.  An

25

MRI of the claimant's cervical spine revealed congenital narrowing of the canal, degenerative changes and moderate stenosis at her C3-5 and mild stenosis at her C2-3 and C5-6.  During recent physical examination, the claimant had normal flexion, extension and lateral bending of her cervical spine.  An x-ray of the claimant's right shoulder was unremarkable.  During physical examination, she exhibited limited range of motion and joint tenderness of her right shoulder.  She underwent a procedure to drain fluid from her shoulder and received a Kenalog injection to treat her pain.  More recent treatment notes showed the claimant had improved range of motion of her right shoulder.  Regarding the claimant's carpal tunnel syndrome, an EMG and nerve conduction study revealed moderate bilateral median neuropathy without evidence of denervation.  Treatment notes indicated that she exhibited bilateral wrist tenderness but had normal range of motion.  She also exhibited normal motor strength of her bilateral upper extremities.

(Tr. 73-74 (citations omitted).)  The prior ALJ then adopted an RFC limiting Ms. Goins to sedentary work with other limitations that included occasional overhead reaching and frequent reaching in other directions, handling, fingering, and using hand controls. (Tr. 72.)

With respect to the same impairments, the ALJ in the present case observed:

The claimant was diagnosed with fibromyalgia and rheumatoid arthritis. The claimant had positive antinuclear antibody tests. The claimant reported experiencing arthralgias and myalgias. The claimant was prescribed Topamax, amitriptyline, and sulfasalazine for fibromyalgia. The claimant was prescribed methotrexate and Lyrica for rheumatoid arthritis. However, the claimant had musculoskeletal examinations with no edema or tenderness. Additionally, the claimant reported feeling better after seeing a rheumatologist for rheumatoid arthritis and fibromyalgia. The claimant also reported doing very well on Lyrica.

. . .

The claimant exhibited degenerative changes of the lumbar spine and scoliotic curvature and degenerative change of the thoracic spine. In February 2018, the claimant underwent radiographs of the lumbar spine, which showed degenerative changes, mild retroscoliosis, and disc disease. In April 2018, the claimant underwent radiographs of the thoracic spine, which showed mild spondylosis. In June 2018, the claimant underwent magnetic resonance imaging of the lumbar spine, which showed multilevel degenerative changes. The claimant had tenderness to palpation over the thoracic and lumbar spine. The claimant received lumbar facet block and injections. The claimant was prescribed diclofenac, lidocaine, and naproxen. However, the claimant had normal back examinations with normal curvature. The claimant reported that her back pain was doing well. The claimant also had normal musculoskeletal examinations with no edema or tenderness.

The claimant exhibited degenerative changes of the cervical spine and right shoulder bursitis. In November 2018, the claimant underwent x-rays of the cervical spine, which showed mild spondylosis and straightening of the normal cervical lordosis. In July 2019, the claimant underwent imaging, which showed mild degenerative change in the right shoulder. In July 2019, the claimant underwent x-rays of right shoulder, which showed mild degenerative arthritis of the right glenohumeral joint and mild degenerative change of acromioclavicular joint. The claimant had painful neck range of motion. The claimant had tenderness and decreased range of motion of the right shoulder. The claimant had decreased strength of the right shoulder. The claimant had positive Jobe test and Spurling sign. However, the claimant had normal cervical spine and neck examinations with supple neck, normal range of motion, and no cervical lymphadenopathy. The claimant had improved right shoulder range of motion. The claimant also had normal musculoskeletal examinations with no edema or tenderness.

(Tr. 21-22 (citations omitted).)

Consistent with *Earley*, it is evident that the ALJ in this case conducted a fresh review of the new record evidence before concluding that the RFC limitations from the 2018 ALJ decision remained appropriate.  The Court accordingly finds no procedural error in the present ALJ's consideration of the 2018 ALJ decision and adoption of the same RFC.  As the *Earley* court explained, the ultimate analysis the Court must apply is a "substantial evidence" analysis.  Thus, the Court will turn to whether the RFC was supported by substantial evidence.

### 2. Whether RFC was Supported by Substantial Evidence

Ms. Goins argues the RFC is not supported by substantial evidence because the ALJ "minimize[ed] evidence that demonstrates obvious and significant worsening of impairments, and . . . overstat[ed] the relevance of transient improvements in symptoms while ignoring later evidence of worsening of those same impairments."  (ECF Doc. 11, p. 17.)  More specifically, she argues the ALJ cherry-picked, selectively parsed, or mischaracterized evidence relating to her low back, rheumatoid, and right shoulder impairments (ECF Doc. 11, pp. 17-20), and that the evidence supported additional RFC limitations to account for those impairments (*id*. at p. 19).

27

It is generally recognized that an ALJ may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding. *See, e.g., Gentry v. Comm'r*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where ALJ failed "to address certain portions of the record, including the evidence of a continuing illness that was not resolved despite use of increasingly serious and dangerous medications"); *Minor v. Comm'r*, 513 F. App'x 417, 435 (6th Cir. 2013) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis). Yet, "the ALJ does not 'cherry pick' the evidence merely by resolving some inconsistencies unfavorably to a claimant's position." *Solembrino v. Astrue*, No. 1:10–cv–1017, 2011 WL 2115872, at *8 (N.D. Ohio May 27, 2011). The Sixth Circuit has explained that allegations of cherry-picking evidence are "seldom successful because crediting it would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. Apr. 3, 2014) (citing *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009) (finding "little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence.")).

In support of her cherry-picking argument, Ms. Goins argues the ALJ: (i) "significantly minimize[d]" the findings of her 2018 lumbar MRI (ECF Doc. 11, p. 17); (ii) "grossly distort[ed] the medical facts" when "string-citing '*exams without tenderness*' of the back" (*id*. at pp. 17-18); (iii) noted she was doing well on Lyrica but ignored a later treatment note stating Lyrica was no longer working (*id.* at p. 18 (table)); and (iv) failed to mention that she "was approved to undergo right shoulder subacromial decompression, capsular release and biceps tenotomy" (*id.* at p. 19). She then argues that those and other records are "persuasive evidence" supporting additional RFC limitations beyond those adopted in the 2018 ALJ Decision. (*Id.*)

i.        **Whether ALJ Mischaracterized 2018 MRI Findings**

With respect to Ms. Goins' June 2018 MRI, the ALJ observed: "In June 2018, the

claimant underwent magnetic resonance imaging of the lumbar spine, which showed multilevel

degenerative changes."  (Tr. 21 (citing Tr. 695).)  Ms. Goins asserts "this statement significantly

minimizes the actual findings of this MRI that documented multiple disc herniations causing

*mass effect on the nerve roots* at L2, L3, and L4."  (ECF Doc. 11, p. 17 (emphasis in original).)

As an initial matter, it is observed that an ALJ is not "required to discuss each piece of

data in [his] opinion, so long as [he] consider[s] the evidence as a whole and reach[es] a reasoned

conclusion."  *Boseley v. Comm'r of Soc. Sec.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing

*Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006) (per curiam)); *see*

*also Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004) (noting a "failure to

discuss … observations does not indicate that they were not considered" and "[a]n ALJ need not

discuss every piece of evidence in the record for his decision to stand").

While Ms. Goins is correct that the imaging records for the 2018 lumbar MRI do set forth

detailed findings regarding disc herniations and stenosis with mass effect on nerve roots, it is

also true that radiologist David Boyd, M.D. summarized the findings with following conclusion:

> Epidural lipomatosis/congenital central canal narrowing noted.
> Multilevel degenerative changes as described.
> No substantial ligamentum flavum hypertrophy is identified.

(Tr. 695.)  In this context, the ALJ's description of the MRI findings as documenting "multilevel

degenerative changes" was both accurate and consistent with the radiologist's specific findings

as to that MRI.  The ALJ did not mischaracterize the MRI findings.

ii.       **Whether ALJ Mischaracterized Physical Examination Findings**

Ms. Goins next asserts the ALJ "grossly distort[ed] the medical facts" when he "string-

cit[ed] '*exams without tenderness*' of the back" because the cited records "were either for visits

unrelated to a back impairment . . . , and thus irrelevant, or they actually did document tenderness and other restrictions on examination."  (ECF Doc. 11, pp. 17-18 (emphasis is original).)  In making this argument, she appears to reference the ALJ's observation in discussing the lumbar impairment that: "The claimant also had normal musculoskeletal examinations with no edema or tenderness."  (Tr. 21-22 (citing Tr. 742 (ER), 865 (rheumatology), 876 (internal medicine), 1113 (pain management), 1137 (ER), 1145 (internal medicine), 1290 (internal medicine), 1374 (ER), 1406 (internal medicine), 1516 (ER), 1526 (pain management).)

First, Ms. Goins argues it was a mischaracterization for the ALJ to describe certain records as "exams without tenderness" because those treatment visits were for complaints "unrelated to a back impairment . . . , and thus irrelevant."  (ECF Doc. 11, p. 18.)  She fails to explain, however, why an ALJ would be constrained to consider only those objective physical examination findings made by providers specifically treating her back impairment.  In assessing disability, an ALJ must consider "all evidence" in the record, 20 C.F.R. § 404.1520(a)(3), which includes objective evidence like medical signs, *see* 20 C.F.R. § 404.1513(a)(1); 20 C.F.R. § 404.1502(f).  While physical examination findings from a pain management or rheumatology provider are certainly relevant in evaluating back pain, the objective findings of any treating providers may also be relevant to that same analysis.

Moreover, the findings cited by the ALJ were not only from ER visits, but also from office visits with internal medicine, rheumatology, and pain management providers.  As to the rheumatology visit, the ALJ accurately observed that Ms. Goins' provider recorded a "normal musculoskeletal examination[] with no edema or tenderness" (Tr. 21-22) while treating her for aches and pains associated with osteoarthritis and rheumatoid arthritis (Tr. 862-65).  The same characterization of her examination findings was accurate as to her internal medicine visits,

30

where she complained of chronic pain, back and neck pain, and/or body aches and pains related to rheumatoid arthritis and fibromyalgia. (Tr. 874-76, 1141-45, 1287-90, 1402-06.)

As to the two cited pain management records, however, Ms. Goins argues the ALJ's characterization of those exams as normal and without tenderness "grossly distort[s] the medical facts" because they "actually did document tenderness and other restrictions on examination." (ECF Doc. 11, p. 18.) She is correct that the first of the two exams documented "*severe tenderness* to palpation over the lumbar sacral spine," positive facet loading, and considerable guarding and reduced range of motion, but also *no tenderness* over the spinous process and trochanteric bursa. (Tr. 1113 (emphasis added).) Somewhat inconsistently, the examination also documents normal tone and motor strength, *no tenderness*, normal movement of all extremities, and no edema. (*Id.*) The second examination states: "*P[atient] reports Severe tenderness* to palpation over cervical spine," with *no tenderness* over the trochanteric bursa but "considerable reduced [range of motion]." (Tr. 1526 (emphasis added).) Thus, while the exams document some normal findings, they do not document wholly normal examinations without tenderness.

Ms. Goins asserts that the ALJ's citation to the two pain management records reflects an "extreme level of cherry picking" that warrants remand. (ECF Doc. 11, p. 19.) This argument must fail for several reasons. First, it is observed that many findings in the two exams are normal, and that one of the two findings of "severe tenderness" was noted to be based on self-report. But even setting those arguments aside, the cherry-picking argument must fail because the ALJ decision fully acknowledges that Ms. Goins sometimes demonstrated tenderness to palpation of her spine. (*See* Tr. 21 ("The claimant had tenderness to palpation over the thoracic and lumbar spine.") (citing Tr 656 (9/17/18 pain management visit).) In assessing Ms. Goins' lumbar impairment, the ALJ highlighted both normal examination findings and those that

31

reflected tenderness to palpation.  (Tr. 21-22.)  The record thus does not support a finding that the description of Ms. Goins' physical examination findings mischaracterized the evidence.

### iii.    Whether ALJ Mischaracterized Treatment with Lyrica

Although not fully articulated, Ms. Goins also suggests the ALJ's observation that she was doing well on Lyrica amounted to a mischaracterization of the evidence because a later treatment record indicated that Lyrica was no longer helping.  (ECF Doc. 11, p. 18 (table) (citing Tr. 862, 1128).)  When discussing Ms. Goins' fibromyalgia and rheumatoid arthritis, the ALJ observed that Ms. Goins "reported feeling better after seeing a rheumatologist" and "reported doing very well on Lyrica."  (Tr. 21 (citing Tr. 1128, 1402).)

There is no dispute that the ALJ accurately described the medical records.  In December 2018, Ms. Goins reported to her internal medicine provider that she "overall [felt] much better since she started seeing her rheumatologist for rheumatoid arthritis and fibromyalgia."  (Tr. 1128.)  She then reported to internal medicine in January 2019 that she continued to have body aches and pains related to her rheumatological impairments, but was doing "very good with Lyrica."  (Tr. 1402.)

Rather than challenging the accuracy of this summary, Ms. Goins argues the ALJ selectively parsed the record because he did not acknowledge a later record from March 2019 where Ms. Goins reported Lyrica was not helping with her pain.  (ECF Doc. 11, p. 18 (citing Tr. 862).)  That record reflects that Ms. Goins told her internal medicine provider that Lyrica was no longer helping with her pain and asked about medical marijuana; she was approved for medical marijuana, but was also advised to see her rheumatologist to adjust her medications.  (Tr. 862-65.)  Her medications were then adjusted at follow-up appointments with rheumatology in April and July 2019, and she was told to continue using Lyrica for fibromyalgia.  (Tr. 810, 815.)  At

those rheumatology visits, she was noted to be doing better clinically and to have her rheumatoid arthritis in better control.  (*Id*.)

In this context, it is again noted that an ALJ is not "required to discuss each piece of data in [his] opinion, so long as [he] consider[s] the evidence as a whole and reach[es] a reasoned conclusion." *Boseley*, 397 F. App'x at 199.  While the ALJ did not provide an analysis of Lyrica's efficacy at every treatment visit, he also did not misrepresent the records.  In discussing the rheumatological impairments, he acknowledged Ms. Goins' complaints, described her various medications, highlighted her largely normal physical examinations, and observed that she reported improvement with treatment, including with Lyrica.  (Tr. 21.)  While the ALJ did not specifically discuss her later report of reduced effectiveness, the Court observes that she continued using Lyrica and was observed to be doing better clinically and to have better control over her conditions.  In these circumstances, the Court concludes that it was both accurate and consistent with the evidence as a whole for the ALJ to observe that Ms. Goins reported doing well with Lyrica.  Thus, the Court finds that the record does not support a finding that the ALJ mischaracterized the evidence with respect to Ms. Goins' treatment with Lyrica.

### iv.  Whether ALJ Erred by Failing to Note Approval for Surgery

Ms. Goins next asserts that the ALJ erred because he failed "to mention the fact that, after examination by a surgeon, [she] was approved to undergo right shoulder subacromial decompression, capsular release and biceps tenotomy."  (ECF Doc. 11, p. 19 (citing Tr. 1198).) Ms. Goins is referring to records for an office visit with Dr. Gobezie in September 2019 which note that she was approved for surgery for her right shoulder adhesive capsulitis.  (Tr. 1198.) She was instructed to call to schedule her surgery.  (*Id*.)  A year later, in September 2020, the ALJ asked Ms. Goins the status of this surgery, and she answered as follows:

ALJ: Okay. Now when I reviewed your medical records it looks like at one point you had been considered for a shoulder surgery with a doctor, is that correct?

Plaintiff:  Correct.

ALJ:  And what is the status of that?

Plaintiff:  Due to covid I haven't been able to go and then I told you about the bout of pneumonia. So, I haven't been able to actually go into the office and – because we were on the verge of setting it up for the surgery but then covid came and all office visits and everything and then I haven't been able to do my back stuff either so I was trying to wait till I did my back injections and then I was going to go ahead and call the doctor back.

(Tr. 50-51.)

Ms. Goins is correct that the ALJ did not then describe her surgery referral in the decision itself.  He did acknowledge her assertion that she could not "lift her arm" (Tr. 21), and noted the following objective medical findings relating to her shoulder:

> The claimant exhibited degenerative changes of the cervical spine and right shoulder bursitis. . . .  In July 2019, the claimant underwent imaging, which showed mild degenerative change in the right shoulder. In July 2019, the claimant underwent x-rays of right shoulder, which showed mild degenerative arthritis of the right glenohumeral joint and mild degenerative change of acromioclavicular joint. . . . The claimant had tenderness and decreased range of motion of the right shoulder. The claimant had decreased strength of the right shoulder. The claimant had positive Jobe test and Spurling sign. . . . The claimant had improved right shoulder range of motion. The claimant also had normal musculoskeletal examinations with no edema or tenderness.

(Tr. 22 (citations omitted).)  Given the ALJ's comprehensive discussion of the objective medical evidence relating to Ms. Goins' shoulder impairment and his specific inquiry as to the status of her surgical referral at the hearing, the court concludes that the ALJ did "consider the evidence as a whole" relating to her shoulder impairment, including her surgical referral. *Boseley*, 397 F. App'x at 199.  And given the passage of time since the surgical referral was made, the ALJ did not err in failing to discuss that referral in his decision.  Thus, the Court finds the record does not

support a finding that the ALJ's failure to mention the surgical referral amounted to cherry-picking or a mischaracterization of the evidence.

For all of the reasons set forth above, the Court finds that the record does not support a conclusion that the ALJ engaged in "cherry-picking" or mischaracterized the medical records.

### v.  Whether Substantial Evidence Supported ALJ's Adoption of Same RFC Previously Adopted in 2018 ALJ Decision

Ms. Goins also argues that the ALJ should have concluded that new evidence regarding her lumbar, rheumatological, and right shoulder impairments required additional RFC limitations beyond those adopted in the 2018 ALJ decision.  As to the lumbar impairment, she argues the 2018 MRI findings and treatment with facet injections and medial branch blocks are "persuasive evidence" that support "updating [her] RFC to reflect additional limitation since the prior hearing's RFC."  (ECF Doc. 11, p. 19.)  She also argues her inflammatory arthritis combined with her back pain "warranted greater limitations in [her] ability to sit, stand and walk . . . and, in fact, requires her to lay down and sleep much of the day."  (*Id.*)  Finally, she argues that her right shoulder impairment warranted additional limitations for worsening symptoms.  (*Id.*)

As an initial matter, it is observed that the question upon appeal is not whether there is persuasive evidence to support a finding that further limitations were warranted.  Even if the Court finds substantial evidence supports Ms. Goins' interpretation of the evidence, the Court cannot overturn the ALJ's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.  Thus, the question to be addressed is whether the ALJ's adoption of the 2018 RFC limitations lacked the support of substantial evidence.

With respect to the lumbar impairment, the MRI in question was taken on June 6, 2018 (Tr. 694-95) and therefore predated the prior ALJ's September 2018 decision (Tr. 63).  While it was appropriate for the ALJ to consider that MRI in his decision, particularly since it was not

discussed in the prior decision, it is nevertheless the case that MRI findings from June 2018 –
three months before the 2018 ALJ decision – are not directly supportive of a finding that the
lumbar impairment worsened after that decision.  It is additionally noted that the combination of
normal and abnormal examination findings highlighted by the ALJ in this case are similar to the
examination findings previously highlighted in the 2018 ALJ decision.  (Tr. 73 ("Recent
treatment notes indicated that the claimant exhibited tenderness to palpation of her lumbar sacral
spine; however, she had full range of motion of her back, her straight leg raise was negative, and
she ambulated independently.") (citation omitted).)  Finally, there is no question that the ALJ
accurately described Mr. Goins' treatment for her lumbar impairment since 2018 – including
lumbar facet blocks, injections, and medication – and the effectiveness of that treatment.  (Tr. 21
(citing Tr. 653 (10/18 lumbar facet block), 1113 ("chronic pain s/p lumbar facets with great
relief"), 1117 (5/19 lumbar facet block), 1533 (listing medications prescribed for multiple-level
lumbosacral spondylosis without myelopathy).)  Similar treatment is described in the 2018 ALJ
decision.  (Tr. 73 ("To treat her back pain, the claimant underwent a lumbar facet block
procedure.").)  Given these facts, the Court finds Ms. Goins has failed to demonstrate that the
ALJ lacked substantial evidence to support adoption of the same RFC limitations in this case.

With respect to her rheumatoid arthritis and fibromyalgia, Ms. Goins argues that her
"inflammatory markers remained elevated despite medication modification," warranting further
limitations.  (ECF Doc. 11, p. 19.)  As discussed above, the ALJ provided a detailed and accurate
discussion of Ms. Goins' positive ANA testing, reported symptoms, treatment with medications,
largely normal physical examinations, and reported improvement with treatment.  (Tr. 21.)  The
Court also observes that the rheumatology treatment records document improvement with
medication changes and reductions in levels of disease activity.  (Tr. 810, 815, 878, 1141, 1242,

1499.)  While Ms. Goins is correct that the 2018 ALJ decision did not document similar levels of

disease activity for these impairments (Tr. 73-74), it was nevertheless within the ALJ's purview

to conclude that Ms. Goins' symptoms were sufficiently limited (consistent with her physical

exam findings) and sufficiently controlled by treatment (consistent with reported improvement

and reduced disease levels) to nevertheless warrant the same RFC limitations.  The Court finds

again that Ms. Goins has not demonstrated that the ALJ lacked substantial evidence to support

his adoption of the same RFC limitations in this case.

      With respect to the right shoulder impairment, Ms. Goins acknowledges that the ALJ

"properly notes many examples of tenderness and pain in the right shoulder, decreased strength

and decreased range of motion in the right shoulder, as well as multiple tests confirming

impingement."  (ECF Doc. 11, p. 19 (citing Tr. 22).)  In light of those findings, she contends the

ALJ should have included "additional limitations in the RFC for these worsening symptoms."

(*Id.*)  Comparing the findings of both ALJs, both decisions highlighted Ms. Goins' limited range

of motion and joint tenderness in her right shoulder, as well as some documented improvement

in her range of motion.  (Tr. 22, 74.)  The 2018 ALJ decision also described an unremarkable x-

ray, a procedure to drain fluid from the shoulder, and a Kenalog injection for pain.  (Tr. 74.)  In

contrast, the present decision described x-rays showing mild degenerative change, decreased

strength, and a positive Job test and Spurling sign.  (Tr. 22.)  As discussed above, the ALJ

acknowledged in the hearing that Ms. Goins was referred for shoulder surgery, but she

acknowledged in testimony that she had not yet had the surgery a year later.  (Tr. 50-51.)  While

there are distinctions between the findings discussed in both decisions that could support the

adoption of additional right shoulder limitations, Ms. Goins has not shown the ALJ lacked

substantial evidence to support adoption of the same limitations.

A claimant's "residual functional capacity is the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). "The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing See 20 C.F.R. §§ 404.1546(c), 416.946(c)). An ALJ assesses a claimant's "residual functional capacity based on all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(1). "[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe*, 342 Fed. App'x at 157.

Here, the ALJ found that Ms. Goins had the RFC to perform sedentary work with the following additional limitations:

> she can frequently operate right and left foot controls; frequently operate right and left hand controls; occasionally reach overhead with the right and left; frequently in all other directions with the right and left; frequently handle with the right and the left; frequently finger with the right and the left; occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle; can frequently be exposed to humidity and wetness, dust, odors, fumes, and pulmonary irritants, extreme cold, and extreme heat; limited to performing simple, routine and repetitive tasks, but not at a production rate pace (i.e. assembly line work); limited to simple work related decisions in using her judgment and dealing with changes in the work setting; and able to frequently interact with supervisors, coworkers, and the public.

(Tr. 19.)  He further explained his adoption of specific limitations addressing Ms. Goins' back, rheumatological, and right shoulder impairments as follows:

> The claimant's decreased strength and range of motion of the right shoulder and painful neck range of motion support a limitation to sedentary work and the ability to frequently operate right and left hand controls, occasionally reach overhead with the right and left, frequently in all other directions with the right and left, frequently handle with the right and the left, frequently finger with the right and the left, occasionally climb ramps and stairs, and never climb ladders, ropes, or scaffolds. The claimant's tenderness and degenerative changes of the thoracic and lumbar spine support a limitation to occasional balancing, stooping, kneeling, crouching, and crawling. The claimant's antalgic gait, decreased range of motion, and edema

support limitations of no exposure to unprotected heights, moving mechanical parts, or operating a motor vehicle.

(Tr. 25.)

It is not a reviewing court's role to "try the case *de novo*, nor resolve conflicts in evidence," *Garner*, 745 F.2d at 387, and this Court cannot overturn the Commissioner's decision "so long as substantial evidence … supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. As recently explained by the Sixth Circuit:

> [A]t issue in social security cases is not whether [the court] would have reached the same decision on [the] record. When determining whether to affirm the Commissioner's decision, [the court] need not "agree with the Commissioner's finding"; [the court] instead ask[s] whether the decision followed legal standards and "is substantially supported in the record."

*Bowers, v. Comm'r of Soc. Sec.*, No. 21-4069, 2022 WL 1277703, at *1 (6th Cir. Apr. 29, 2022) (citing *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)).)

While the evidence highlighted by Ms. Goins may support additional limitations, it does not go so far as to establish that the ALJ's contrary finding lacked the support of substantial evidence. In reviewing the evidence highlighted by Ms. Goins, the Court finds no basis upon which to conclude that the ALJ's decision lacks the support of substantial evidence.

For the reasons set forth above, the Court finds the ALJ did not improperly cherry-pick or mischaracterize evidence, and that the ALJ's RFC was supported by substantial evidence. Accordingly, the Court finds that Ms. Goins' assignment of error is without merit.

### VII.    Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.

March 13, 2023                          */s/ Amanda M. Knapp*
                                        AMANDA M. KNAPP
                                        UNITED STATES MAGISTRATE JUDGE